# CIRCUIT COURT OF FREDERICK COUNTY

Lake Holiday Country
Club, Inc., et al.

v.

Summit Golf Club, Inc., et al.

September 17, 1999

Case No. (Chancery) 98-62

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court on September 9, 1999, on Defendants' Pleas of the Statute of Limitations and Laches. Stephen H. Moriarty, Esquire, appeared for the Plaintiffs; and David H. Moyes, Esquire, appeared for the Defendants. All of the parties' prefiled exhibits were admitted. Upon consideration of the facts and the argument of the parties, the Court has decided to sustain the Defendants' Pleas of the Statute of Limitations and Laches.

## I. *Statement of Material Facts*

The following material facts are not in dispute.

Lake Holiday is a large, residential, recreational development built around a lake in western Frederick County. Lake Holiday Country Club, a Virginia nonstock corporation, is the homeowner's association for the Lake Holiday Development.

The Summit Golf Club, Inc., is a Virginia Corporation formed in 1985, located and doing business in Frederick County, Virginia. Defendant Simms was the president of Lake Holiday Country Club during the years 1984 to August 26, 1998, and was the president of The Summit Golf Club during the period July 10, 1985, to July 29, 1986.

The property in dispute in this case is land comprising an eighteen hole golf course within the Lake Holiday community.

On November 14, 1985, an agreement was executed among the Summit Golf Club, Lake Holiday Country Club, and Independent Land Capital incident to the settlement of a back dues claim that Lake Holiday Country Club had against Independent Land Capital. The purposes of this agreement, in relevant part, were the following:

> a. The Summit Golf Club agreed to construct the back nine holes of the golf course and, possibly, redesign of the existing front nine;
>
> b. Independent Land Capital agreed to convey the back nine to Summit Golf Club upon certain terms in contravention of Lake Holiday Country Club's option to acquire this land;
>
> c. The Summit Golf Club agreed to construct the back nine pursuant to Ault, Clark & Associates' specifications;
>
> d. Lake Holiday Country Club agreed to convey the front nine to Summit Golf Club upon receipt of a certificate of substantial completion of the back nine; and
>
> e. The Summit Golf Club agreed to various easements in favor of Independent Land Capital and Lake Holiday Country Club, and that this agreement would not adversely affect the settlement agreement between Independent Land Capital and Lake Holiday Country Club of 1984.

Simms signed the November 14, 1985, agreement on behalf of the Summit Golf Club and Lake Holiday Country Club. The Summit Golf Club's obligations under the agreement of November 14, 1985, were contingent upon its receipt of $300,000.00 from the sale of stock by April 1, 1986. The Plaintiffs contend that the members of Lake Holiday Country Club were not informed of the agreement with Ault, Clark & Associates or the terms of the agreement of November 14, 1985, and that at no time was the approval of the members of Lake Holiday Country Club sought or received before the execution of the November 14, 1985, agreement.

On December 6, 1985, Simms and the Summit Golf Club issued a document entitled "Outline of Investment," which described the proposed investment and the development and management plan of the Summit Golf Club. It solicited inquiries, giving a telephone number by which Simms could be reached, which number was that of the Lake Holiday Country Club on-site office. The Outline of Investment stated that Independent Land Capital and Lake Holiday Country Club had agreed "to convey, without charge, to the

[Summit Golf Club] Corporation the existing nine hole golf course and the land on which the new nine holes are to be constructed. At the time of the issuance of the Outline of Investment, the members of Lake Holiday Country Club had not approved, nor been informed of, any agreement by Lake Holiday Country Club to convey the golf course and related option to the Summit Golf Club.

At the June 29, 1986, Annual Meeting of the Lake Holiday Country Club, there was a discussion about the plan to form the Summit Golf Club and transfer the Lake Holiday Golf Course to this corporation as well as other land on which a second nine holes would be constructed by the Summit Golf Club. The resolution approving this plan was unanimously passed. Plaintiff's Exhibit 3. The minutes of this meeting were distributed to the Lake Holiday membership in May 1987. Plaintiff's Exhibit 2. While the plaintiffs concede that there were between 150 to 200 members of the Country Club present at this meeting, they contend that the notice of the meeting failed to properly inform the membership of the proposed transfer of the golf course, that a quorum was not present, and that Simms' involvement in the new Summit Golf Club was not adequately disclosed.

By deed dated December 9, 1986, Lake Holiday Country Club conveyed to the Summit Golf Club land in Lake Holiday with improvements comprising a nine hole golf course. On January 20, 1987, Lake Holiday conveyed the remaining unimproved parcels to the Summit Golf Club, and shortly after acquiring it, the Golf Club constructed a second nine holes for the golf course, which were completed by March 1987. (Plaintiff's Exhibit 16.) The Plaintiffs have challenged these conveyances claiming that they were fraudulently procured and failed to comply with the requisite corporate formalities.

Plaintiffs Bloomingdale and Keister are late arrivals to the controversy, because they both purchased their lots in the Lake Holiday development after 1987. Bloomingdale purchased his lot in 1989, and Keister purchased his lot in 1988. As lot owners, they are members of the Lake Holiday Country Club.

In 1987, a group of dissatisfied members of Lake Holiday Country Club formed an *ad hoc* group called "The Friends of the Summit." Among the primary grievances of this group were Simms' management of Lake Holiday Country Club and the golf course transfers. As early as October 5, 1987, the objections and complaints of this group were sufficiently circulated within the Lake Holiday development that Simms deemed it necessary to respond to the Lake Holiday Country Club membership about their complaints. See Plaintiff's Exhibits 17 and 18.

Beginning in September 1987, a series of lawsuits were filed by various members of the Lake Holiday Country Club challenging Simms's management of the country club.

On September 18, 1987, thirty-seven members of Lake Holiday Country Club filed a suit in the Circuit Court of Frederick County styled *Evitt* v. *Lake Holiday Country Club, Inc.*, Frederick County, Chancery No. 87-222. The original Evitt bill of complaint as well as the amended bill of complaint filed on December 3, 1987 (Defendant's Exhibit 57), sought to obtain access to the records of Lake Holiday Country Club so that the members could assess the Lake Holiday Country Club's management in twelve separate areas, the second of which was:

> the propriety of the transfer of 207.05 acres of land within the Summit to the Summit Golf Club, Inc., a Virginia stock corporation incorporated by Mr. Simms in 1985 and owned by him and certain investors selected by him. Out of the land conveyed, 101.25 acres had been subject to an option to acquire by the Property Owners Association, for use as holes 10-18 of a golf course, and 105.8 acres were owned by the Property Owners Association and in use as holes 1-9 of the golf course. The evaluation of these transactions was to include the adequacy of the consideration, the adequacy of notices and corporate approvals related to the transactions, the extent of conflicts of interest, breaches of fiduciary obligations or interceptions of corporate opportunities and waste of the corporate assets by management, officers and/or directors of the Property Owners Association.

(Plaintiff's Exhibit 57, pp. 6-7.)

Paragraph 26 of both bills of complaint went on to state:

> The transfer of the golf course land to the Golf Club, which was owned in whole or in part by the President [Simms] and one of more directors of the Property Owners Association [Lake Holiday Country Club], *may have constituted fraud* against, or diversion of, the Property Owners Association in breach of the fiduciary duties of the President/Director and other directors to the Property Owners Association and its members.

(Sept. 18, 1987, Bill of Complaint, emphasis added.)

The December 3, 1987, amended bill of complaint (Plaintiff's Exhibit 57) contains very detailed factual statements about the golf course conveyances and indicates that the Plaintiffs questioned the corporate procedure by which the conveyances had been accomplished and expressed their belief that fraud may have been committed. The underlying facts and the suspected fraud are the same as those alleged in the pending 1998 suit. This 1987 suit was ultimately dismissed under the two-year rule on June 11, 1992.

In 1988 another *Evitt* suit was filed, *Evitt* v. *Lake Holiday*, Frederick County, Chancery No. 88-294, and there is a document in that case signed by various members of the Lake Holiday Country Club, which sought "To ascertain what land sales, or other transactions, have taken place between persons on the board of Lake Holiday Country Club, Inc., and Lake Holiday Estates Utility Co., Inc., and the Summit Golf Club, Inc., and/or Independence Land and Capital, Inc. ... . This second *Evitt* case was also dismissed under the two-year rule pursuant to Virginia Code § 8.01-335 on January 8, 1992.

On September 5, 1989, sixty-one members of Lake Holiday Country Club sued Simms and Lake Holiday Country Club, *Oren* v. *Lake Holiday Country Club, Inc.*, Frederick County, Chancery No. 89-230, challenging the corporate procedures which Simms and the Board of Directors of Lake Holiday were using in their management of the Country Club. Like the other suits, this suit was ultimately dismissed under the two-year rule.

On July 12, 1993, in *Bates* v. *Lake Holiday Country Club, Inc.*, Frederick County, Chancery No. 93-193, two members of Lake Holiday Country Club filed suit seeking access to the records of the Lake Holiday Country Club, which prayer was granted on November 16, 1995. (Plaintiff's Exhibit 59.)

Most recently, in a separate suit filed in 1998, *Bloomingdale* v. *Lake Holiday Country Club*, Frederick County, Law No. 98-64, Simms was removed by this Court from the management of the Lake Holiday Country Club in August 1998 for mismanagement reasons unrelated to the golf course transactions.

On February 27, 1998, the Plaintiffs filed the pending suit in the Circuit Court of Frederick County, Virginia, which is more than ten years after the conveyances of the golf course land, which the plaintiffs now seek to rescind. The Defendants have filed Pleas of the Statute of Limitations and Laches to the pending suit.

Additional material facts are set forth in the factual chronology filed by the Plaintiffs which sets forth facts which are not in dispute.

## II. *Conclusions of Law*

"A statute of limitations is designed to compel the exercise of a right to sue within a reasonable time; to suppress fraudulent and stale claims; to prevent surprise; to guard against lost evidence; to keep facts from becoming obscure; and to prevent witnesses from disappearing." *Lavery v. Automation Management Consultants, Inc.*, 234 Va. 145, 148, 360 S.E.2d 336 (1987). "[S]tatues of limitations rest upon reasons of sound public policy in that they tend to promote the peace and welfare of society, safeguard against fraud and oppression, and compel the settlement of claims within a reasonable time after their origin and while the evidence is fresh in the memory of the witnesses." 51 Am. Jur. 2d, *Limitation of Actions*, § 18.

"It is a well-established principle uniformly acted upon by courts of equity, that in respect to the statute of limitations equity follows the law; and if a *legal demand* be asserted in equity which at law is barred by statute, it is equally barred in equity." *Belcher v. Kirkwood*, 238 Va. 430, 433, 383 S.E.2d 729 (1989), *quoting Sanford v. Sims*, 192 Va. 644, 649, 66 S.E.2d 495, 498 (1951) (emphasis added); *see also, Marriott v. Harris*, 235 Va. 199, 212-13, 368 S.E.2d 225, 231 (1988). The statute of limitations for a fraud action applies where the misrepresentations are made incident to a conveyance of real property. *See STP Marketing Corp. v. Zolfaghari*, 240 Va. 140 (1990) (fraud in execution of deed of trust); *Bergmueller v. Minnick*, 238 Va. 332, 336-37, 383 S.E.2d 772 (1989) (it was represented that a successful perc had been made on the property, when that was untrue); and *Pigott v. Moran*, 231 Va. 76, 341 S.E.2d 179 (1986) (misrepresentation of zoning of adjacent property). For causes of action accruing on or after July 1, 1987, "every action for damages resulting from fraud shall be brought within two years after the cause of action accrues." Va. Code § 8.01-243(A).

The principle of laches was discussed extensively in this Court's April 5, 1999, Opinion and Order. Laches is a neglect or omission to assert a right for an unreasonable and unexplained length of time, under circumstances that are prejudicial to an adverse party. *McNeir v. McNeir*, 178 Va. 285 (1941); *Finkel Outdoor Products, Inc. v. Bell*, 205 Va. 927 (1965).

There is distinction between the defendants as to whether they may rely on the defense of laches in this case. Since laches is a form of estoppel, it is for the protection of the innocent, and it may not be employed as a shield by a culpable party to protect him from liability for his misdeeds. "[A] party may not properly base a claim of estoppel in his favor on his own wrongful act or

dereliction of duty, or fraud committed or participated in by him, or on acts or omissions induced by his own conduct, concealment, or representations." 28 Am. Jur. 2d, *Estoppel and Waiver*, § 79. *See Stewart v. Lady*, 251 Va. 106, 465 S.E.2d 782 (1996) (fight among corporate directors, laches did not apply, because no prejudice proven). Whoever invokes an equitable doctrine like laches must himself have clean hands. *See Lunsford v. Hanbuck*, 247 Va. 519, 526, 443 S.E.2d 134 (1994) (specific performance denied, because parties did not have clean hands). The significance of this point as it applies to this case is that the ultra vires action is an action against the Golf Club corporation, some of whose stockholders are innocent, so the Golf Club can assert the shield of laches, but Simms individually may not. However, the action against Simms individually is based on his alleged fraud, and as the Court has ruled hereafter, the statute of limitations has run on the fraud action against Simms.

"[A] defrauded party [must] … act promptly for the protection of his rights … lest by delay the relations of the parties be changed, the rights of innocent third persons intervene, and the peace of society be disturbed." Opinion by Judge Burks in *Dry v. Rice*, 147 Va. 331, 137 S.E. 473, 475 (1927). Based on the evidence heard on May 20, 1999, this Court ruled that "the evidence shows that innocent third parties have relied upon the conveyances sought to be rescinded (the 1986 and 1987 golf course conveyances) to their financial detriment" in that they purchased stock in the Golf Club in reliance on the fact that it owned the land on which the golf course was situate. Therefore, the prejudice to innocent parties requirement for the application of the doctrine of laches has been established. *See generally* 7A M.J., *Equity*, §§ 32-33. More than ten years have elapsed since the time that a reasonably prudent Country Club member could have ascertained sufficient information to trigger a duty to inquire into the corporate formalities attendant to the property transfers. If they were at the 1986 annual meeting, they witnessed the procedure and could draw their own conclusions. If they did not go to the meeting, when they learned of the transaction, they could review the notice of the meeting and see that the notice did not include the fact that a major asset of the Country Club was being conveyed to another corporation of which Carl Simms was the president and sole director. As the Court stated at the hearing, the time period within which to ascertain whether prejudice to an innocent party has occurred in this case will be the date on which Golf Course stock was first issued to an innocent party, which was sometime in the spring of 1986. The time that a due diligence inquiry would have been triggered with respect to the potential ultra vires nature of the conveyances would be, at the latest, December 3, 1987, when the amended bill of complaint was filed in *Evitt v. Lake Holiday*, Frederick County, Law

No. 87-222. "Laches cannot be applied against one who is ignorant of his rights." *Langley v. Meredith*, 237 Va. 55, 65, 376 S.E.2d 519 (1989). However, the facts recited in the 1987 *Evitt v. Lake Holiday* suit show not only were the members of the Country Club aware of their rights, they had retained counsel and filed suit to vindicate those rights.

The instant case is distinguished from *Princess Anne Civic League v. Susan Constant R. E. Trust*, 243 Va. 53, 58, 413 S.E.2d 599 (1992), where like the instant case, members of a nonstock corporation challenged the corporate procedure by which land had been conveyed by the corporation, because in *Princess Anne* the title to the land in question was still held by the nonstock, civic league and there was no evidence that the rights of innocent parties, like the innocent stockholders in this case such as Mrs. Chapman, had been prejudiced by the delay. In this case, the transaction could not be rescinded without providing for the interests of the innocent persons who purchased stock in the Golf Club relying on the fact that the Golf Course owned the land on which it was constructed.

The delay in this case is over ten years. While not dispositive, the Court in the exercise of its discretion noted that this time period is five times the time period for filing a fraud action, five times the time period for filing an action against a corporate director for improper distributions from the corporation, Virginia Code § 13.1-692 (two years), and twice the time for bringing an action on a written contract, Virginia Code § 8.01-246(2) (five years). Ten years is an inexcusable delay in filing this suit. The Plaintiffs claim that they were ignorant of the facts, but the averments of *Evitt* bill of complaint dramatically contradict and rebut that argument. "One who would repel the imputation of laches on the score of ignorance must be without fault in remaining so long in ignorance of those rights." *Redford v. Clarke*, 100 Va. 115, 122-23, 40 S.E. 630 (1902).

Virginia Code § 8.01-243(C)(2) provides that a fraud action shall be brought within two years of the date of discovery of the fraud or within two years of the time that the fraud should have been discovered "by the exercise of due diligence." Section 8.01-249 provides that a fraud action accrues upon discovery of the fraud or "when such fraud ... by the exercise of due diligence reasonably should have been discovered."

"Due diligence requires only a good faith, reasonable effort; it does not require that every possibility, no matter how remote, be exhausted." *McDonnough v. Commonwealth*, 25 Va. App. 120, 129, 486 S.E.2d 570, 573 (1997) (discussing the failure to produce a witness at trial). In *STB Mktg. Corp. v. Zolfaghari*, 240 Va. 140, 144-45, 393 S.E.2d 394 (1990), the

Supreme Court considered the due diligence requirement in the context of the statute of limitations for fraud actions and stated:

> The language "by the exercise of due diligence reasonably should have been discovered," as used in Code § 8.01-249, means "[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case." *Black's Law Dictionary* 411 (rev. 5th ed. 1979). Cf. *Dennis v. Jones*, 240 Va. 12, 393 S.E.2d 390 (1990) (decided today) ("diligence," as used in Code § 8.01-316(1)(b) setting forth requirements for order of publication, defined). Whether such due diligence has been exercised must be ascertained by an examination of the facts and circumstances unique to each case. *See Mears v. Accomac Banking Co.*, 160 Va. 311, 168 S.E. 740 (1933) (in action for fraud where seller of bonds regularly paid interest to purchaser for almost six years and purchaser had no reason to suspect that bonds were worthless, purchaser's claim was not barred by statute of limitations because of his lack of due diligence to discover seller's fraud).

In this case a reasonable examination on December 3, 1987, of the public records in the Frederick County Clerk's Office would have revealed that the Country Club property had been conveyed in 1986 and 1987 to the Golf Club and that the transaction was being challenged by thirty-seven members of the Country Club, who suspected fraud by Simms, in the *Evitt* suit. A like inquiry to the State Corporation Commission would have disclosed that Simms was the President and a director of the both the Country Club and of the Golf Course corporation to which the golf course had been conveyed. This apparent conflict of interest, which was readily ascertainable and which was by then the subject of litigation, would have excited the suspicions of any reasonably prudent member of the Country Club, who was not in Simms' camp. "Corporate officers and directors have a fiduciary duty in their dealings with shareholders and must exercise good faith in such dealings." *Adelman v. Conotti Corp.*, 215 Va. 782, 790, 213 S.E.2d 774, 779 (1975). The significance of imposing fiduciary duties upon an agent, such as a corporate officer, is that it restricts the permissible range of the agent's actions and requires that the agent act solely in the interests of his principal, which is the corporation. *See generally* Restatement (Second) of Agency §§ 387-98. Under normal circumstances, corporate officers simply do not form corporations and

then transfer property from one corporation of which they are then president to that new corporation of which they are also president absent full and compete disclosure of the transaction to the members of the transferring corporation. *See* Virginia Code § 13.1-691 (director conflicts of interest).

When a person has notice of a possible right of action, he has a duty to make a reasonable and timely inquiry into the matter to ascertain the facts and assess his position accordingly. As the editors of 58 Am. Jur. 2d, *Notice*, § 14, state:

> Means of knowledge and knowledge itself are, in legal effect, the same thing where there is enough to put a party on inquiry, giving rise to a duty to inquire, failing which a party has notice of information he should have obtained by inquiry. Knowledge which one has or should have is imputed to him. In other words, whatever fairly puts a person on inquiry is sufficient notice where the means of knowledge are at hand. And if one omits to inquire, he is then chargeable with all the facts which, by a proper inquiry, he might have obtained.

This rule was applied by the Supreme Court in the context of the duty of a purchaser of real property to make inquiry in *Allen v. Green*, 229 Va. 588, 594, 331 S.E.2d 472 (1985), and it noted:

> The Greens [who were the aggrieved purchasers of the property] ignored these extrinsic facts [occupancy of the property by the life tenant and the portable nature of the structure in which she was living], coupled with the express reservations in their chain of title, at their peril. They were charged not only with notice of facts expressly stated in the recorded instruments, but also with other "matters therein suggested which might be disclosed upon prudent inquiry." *Chavis v. Gibbs*, 198 Va. 379, 382, 94 S.E.2d 195, 197 (1956); *Jameson v. Rixey*, 94 Va. 342, 348-49, 26 S.E. 861, 863 (1897). They had a duty to inquire as to sources of information reasonably disclosed by matters of record ... . By their own testimony, they chose to ignore these readily available sources of information, whose knowledge was made obvious by the recorded deeds. "Means of knowledge, with the duty of using them, are equivalent to knowledge itself." *Jameson*, 94 Va. at 348, 26 S.E. at 863.

In this case, the conveyances were recorded in the Clerk's office; the corporate officers of the Country Club and the Golf Club were matter of record with the

State Corporation Commission. The Golf Club had solicited the members of the Country Club to buy stock in the Golf Club, and construction on the golf course was undertaken and was the subject of an article in the local newspaper. The 1987 *Evitt* suit was also a matter of public record. Few cases have as much information available to a reasonably prudent person than were available for inspection in this case by December 1987.

Virginia Code § 8.01-249 provides that a cause of action shall be deemed to accrue "[i]n actions for fraud ... when such fraud ... is discovered or by the exercise of due diligence reasonably should have been discovered." By at least December 3, 1987, when the amended bill of complaint was filed in the *Evitt* suit, a reasonably prudent person had access to sufficient facts about the golf course transaction to conclude, as did Mr. Evitt and thirty-six other Country Club members, that a fraud may have been committed with respect to the conveyance of the golf course properties and that there were substantial questions about the corporate procedure by which these transactions had been accomplished. Therefore, insofar as the statute of limitations for fraud is concerned, the right of action accrued and the clock began to run at the latest on December 3, 1987, and the present bill of complaint was not filed until February 27, 1998, which is more than ten years later.

While there may be a smell emanating from the golf course transaction as the Plaintiffs claim, it is now a stale odor. Whether the odor is the remnant of an original stench emanating from the rotten character of the transaction as the Plaintiffs claim or whether it is the lingering trace of some pheromonal musk secreted in the euphoria of the summer of 1986 that bewitched those within its aura will never be known insofar as a legal action is concerned, because one thing is manifestly clear, the plaintiffs' claims are not timely insofar as the legal and equitable time constraints for the filing of legal claims of the nature asserted are concerned. In retrospect, there may be a strong equitable appeal to the Plaintiffs' arguments, and occasionally the strict application of legal procedures may be viewed as obscuring or preventing substantive justice, but as Justice Douglas noted in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 179, 95 L. Ed. 2d 817, 858 (1951):

> It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.

A stale case may not be permitted to go forward in contravention of the governing law just because there may appear to be some substantive merit to it.

## III. *Decision*

For the foregoing reasons, it is adjudged and ordered that:

1. Defendant Carl Simms' Plea of the Statute of Limitations to Count Two (Fraud, Carl Simms) of the Bill of Complaint is sustained.

2. Defendant Summit Golf Club's Plea of Laches to Count One (Constructive Trust) and to Count Three (Ultra Vires) of the Bill of Complaint is sustained.

3. The Bill of Complaint is dismissed with prejudice.

4. The Lis Pendens filed against the subject property shall be released by the Clerk.